UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:23-cr-258 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| WILL A. JOHNSON, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

On May 3, 2023, an indictment was issued charging defendant Will A. Johnson ("Johnson") with one count of distribution of at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). (Doc. No. 15 (Indictment).) Now before the Court is Johnson's motion to suppress evidence seized by the government in connection with this charge. (Doc. No. 25 (Motion).) Plaintiff United States of America (the "government") opposes the motion. (Doc. No. 26 (Opposition).) The Court conducted an evidentiary hearing on the motion on October 6, 2023, and, at the conclusion of the hearing, the Court took the motion under advisement.

For the reasons that follow, the motion to suppress is denied.

I. BACKGROUND

**A. The First Stop**

At the suppression hearing, Ohio State Highway Patrol Sergeant Drew W. Kuehne[1] ("Sgt. Kuehne") testified that during his shift on April 8, 2023, he was stationed on Interstate 71 in

---

[1] Sgt. Kuehne has worked for the Ohio State Highway Patrol for approximately eleven years. He testified that he has participated in between 300 and 500 narcotics investigations.

Morrow County, observing northbound traffic. Around 4:20 a.m., he saw a vehicle with Texas license plates driving very slowly with no other vehicles around it. Sgt. Kuehne testified that this was suspicious because motorists typically drive at or above the speed limit when there is no traffic.[2] When he checked the vehicle's speed, he discovered that it was traveling eleven miles per hour below the speed limit. Sgt. Kuehne began following the vehicle and saw its tires cross over into the next lane twice in violation of Ohio Rev. Code § 4511.33(A)(1). Sgt. Kuehne activated his overhead blue lights to initiate the traffic stop at 4:26:52 a.m. The resulting encounter was captured on Sgt. Kuehne's cruiser camera, and the video recording was played at the hearing. (Gov. Ex. A (First Stop Front Cruiser Camera).) Sgt. Kuehne's conversations with Johnson and his passenger during the stop were captured on his body-worn camera, and this video was also played at the hearing. (Gov. Ex. B. (First Stop BWC).)

    When Sgt. Kuehne approached the vehicle, Johnson was seated in the driver's seat, and a woman (later identified as Alexis Brianna Hill ("Hill")) was seated in the passenger seat. Sgt. Kuehne asked Johnson whether he owned the vehicle, and Johnson responded that it was a rental vehicle. Sgt. Kuehne asked Johnson for the rental agreement so that he could determine who should be in possession of the vehicle. Johnson could not produce a physical copy of the agreement, but he began to look for it on his cell phone. Sgt. Kuehne then proceeded to explain the traffic violations to Johnson. He observed that Johnson was breathing heavily, his hands were shaking, his voice trembled, he made no eye contact, he was clutching his phone, and his carotid artery was pulsing. Sgt. Kuehne testified that all of these behaviors were indicative of an adrenaline rush brought on by excessive nervousness. Sgt. Kuehne explained that most people are a little nervous

---

[2] Through his training and experience from years of observing traffic patterns and participating in "thousands" of traffic stops, St. Kuehne believed that the vehicle was likely a rental car.

when he pulls them over, but that it was immediately evident that Johnson was much more nervous than the typical motorist. Sgt. Kuehne asked Johnson to step out of the car and walk with him to his patrol car. Before exiting the rental car, Johnson gave his phone to Hill so that she could continue the search for the rental agreement. Immediately after exiting the vehicle, Johnson asked Sgt. Kuehne if he could use the restroom. Sgt. Kuehne testified that were no bathrooms nearby, so Johnson's request was essentially seeking permission to urinate on the side of the road. Sgt. Kuehne explained that, in his experience, such a request was "very rare" and was usually made in connection with criminal activity. He also testified that urgently needing to urinate was another sign of excessive nervousness.

Sgt. Kuehne patted Johnson down to ensure that he did not have any weapons and then seated him in the back of his patrol car. He asked Johnson where he was traveling, and Johnson responded that he was going to Buffalo. But Johnson was vague about the details regarding the trip. When Sgt. Kuehne asked where they were staying, he never gave a concrete answer and merely stated, "family house." He then proceeded to offer extraneous information about his family: his father and grandmother had passed away, but his mother was still living. He also seemed unclear about the duration of the trip. When asked how long he was planning to stay with family, he said, "Probably about a week." Sgt. Kuehne testified that he found the lack of clarity on the details of the trip suspicious.[3]

Sgt. Kuehne then inquired into Johnson's relationship to his passenger, and Johnson responded that she was his girlfriend. Sgt. Kuehne tried to follow up on Johnson's vague responses regarding his travel plans, but Johnson continued to give unclear answers. When Sgt. Kuehne

---

[3] Sgt. Kuehne also testified that he found it suspicious that the couple elected to make a cross-country trip in a rental vehicle when he was aware from his experience that it would have been cheaper to fly.

3

asked Johnson for his girlfriend's name, he said it was "Brianna," which Sgt. Kuehne later discovered was actually Ms. Hill's middle name. Johnson indicated that he could not remember her last name, and when he was asked how long they had been dating, he said, "Probably about three months." Sgt. Kuehne also asked Johnson for consent to search the suitcases in the rental car and inquired as to whether he had ever been in trouble with the law. Johnson did not directly respond to the question regarding consent, but, instead, noted that he was "uncomfortable" and believed he was under arrest because he was seated in a police car. Sgt. Kuehne assured him that he was not under arrest and explained that he often placed motorists in his patrol car while he conducted traffic stops. Johnson admitted that he had a criminal record but denied that he had ever been involved with criminal drug activity.

While he was gathering this preliminary information from Johnson, Sgt. Kuehne was waiting for the results of the warrants search he had requested for Johnson. Because Johnson was from out of state, Sgt. Kuehne also requested a criminal history report for Johnson, in addition to a search on his driver's license, to ensure that he did not miss any outstanding warrants. After he finished with his brief questions for Johnson, and while he was still waiting for the results of his warrants search, Sgt. Kuehne left Johnson alone in his cruiser and approached the rental car to speak with Hill. As was the case with Johnson, Hill appeared excessively nervous. Sgt. Kuehne testified that Hill's hands were shaking, she was breathing heavily and was clutching her phone, and she would not make eye contact with him. As their discussion unfolded, Sgt. Kuehne also noticed that she was starting to sweat on her forehead. Sgt. Kuehne explained that, in his

4

experience, innocent passengers are even less likely than an innocent motorist to show any signs of nervousness.[4]

Hill informed Sgt. Kuehne she was still looking for the rental agreement. Sgt. Kuehne testified that, while speaking with Hill, he saw green pieces around the center console that looked like marijuana residue. He shared his suspicion with Hill, and Hill told him the pieces were not marijuana. He then asked her whether there was anything illegal in the suitcases. She responded, "Not in my suitcase." Sgt. Kuehne testified, consistent with the video recording, that Hill stared straight forward with her eyes open while she gave him this answer. When he asked her if there were any illegal contents in the other suitcase, she said, "Not that I know of." Like Johnson, Hill did not consent to a search of the suitcases. Similar to Johnson, when Sgt. Kuehne questioned Hill regarding the travel plans, her answers were vague, and, at times, her account was inconsistent with Johnson's.[5] According to Sgt. Kuehne, Hill appeared to be trying to figure out what she was supposed to tell him as a cover story.[6] The vague and conflicting responses from Johnson and Hill, coupled with their clearly nervous behavior, led Sgt. Kuehne to believe that they were involved in drug trafficking.

After speaking with Hill, Sgt. Kuehne returned to his car, and at 4:45:36 a.m., dispatch returned a criminal history report on Johnson. (Gov. Ex. B.) This report indicated that Johnson had felony drug convictions, contrary to his earlier statement that he had no drug convictions. Sgt.

---

[4] Sgt. Kuehne testified that the typical passenger in a traffic stop is usually "relaxed" and "happy," and often directs some good-natured ribbing at the driver for getting pulled over. He explained that the behavior he was seeing from Hill was usually reserved for individuals who are involved in criminal activity.

[5] She advised Sgt. Kuehne that she was not sure how she was going to get home to Georgia, but that she might fly back. She also did not know how Johnson would get home, suggesting that he might drive.

[6] For example, when Sgt. Kuehne informed Hill that Johnson referred to her as his girlfriend but did not even know her last name, Hill suggested that this was understandable, given that she was merely the "side piece." Sgt. Kuehne took this to mean that she was suggesting that Johnson was cheating on another woman with their relationship.

5

Kuehne explored the possibility of bringing in a K9 Officer for a drug sniff at this point, but dispatch told him none were currently available in the area. Before ending the traffic stop, he explained to Johnson that several of his and Hill's earlier responses had raised his suspicions. Johnson blamed his unclear responses on nervousness resulting from being in the back of a police car. Sgt. Kuehne reiterated that Johnson was not under arrest, and when Johnson repeated that he felt uncomfortable in the police car, Sgt. Kuehne allowed Johnson to stand outside the police car. He also affirmed for a third time that Johnson was not under arrest. He then informed Johnson he would be released with a warning and was free to leave. In response to this news, Johnson told Sgt. Kuehne that he felt like giving him a hug. Sgt. Kuehne testified that this was "a reaction that I have never experienced from somebody who I have stopped and given a warning for a minor misdemeanor violation." Sgt. Kuehne shared with Johnson his belief that Johnson appeared excessively nervous, to which Johnson agreed, saying, "Hell—hell yeah." The first stop concluded at 4:52:57 a.m., approximately 23 minutes after Sgt. Kuehne initiated the stop.

After Johnson and Hill left, Sgt. Kuehne drove to the Highway Patrol post, went inside the building, and reviewed the recording from the backseat video camera during the traffic stop. This video was also played at the hearing. (Gov. Ex. C (First Stop Back Seat Cruiser Camera).) Immediately after Sgt. Kuehne left the police car to speak to Hill,[7] Johnson can be heard stating with consternation, "Oh my god" and "Mm, yeah, it's over." (*Id.*) While alone in the cruiser, Johnson also exclaimed, "Hill! Her last name's Hill" with seeming frustration at his earlier inability to remember Hill's last name. (*Id.*) Through his training and experience, Sgt. Kuehne knew that short-term memory loss is an effect of an adrenalin dump that occurs when someone is

---

[7] In the backseat cruiser camera video, it is apparent that Sgt. Kuehne just left the vehicle because he announces his departure and closes the car door.

6

nervous. Sgt. Kuehne testified that, based on this recording and the totality of what occurred during the first stop, he was "fairly certain" the vehicle contained narcotics. He decided to continue his investigation.

### B. The Second Stop

Sgt. Kuehne testified that he searched for Johnson's vehicle for several hours along Interstate 71 before he located it in the parking lot of a hotel in Belleville, Ohio. He called Ohio State Highway Patrol Trooper Jacob Dickerson ("Trooper Dickerson"), a K9 handler in that district, who advised that he and his K9 Officer, and possibly other support staff, would be available to assist in the event of a second traffic stop. Sgt. Kuehne saw Johnson and Hill leave the hotel in the rental car and followed them. Eventually, Sgt. Kuehne observed the car following too closely behind a commercial motor vehicle, in violation of Ohio Rev. Code § 4511.34.

Section 4511.34 makes it unlawful to follow another vehicle "more closely than is reasonable and prudent[,]" but the statute does not define this term. The Ohio State Highway Patrol has adopted a guideline to assist officers in determining whether a driver has violated this statute. The guideline provides that a motorist should allow one car length between their car and the car ahead for every ten miles per hour of speed. Sgt. Kuehne explained, based on this guideline, that because the rental vehicle was traveling 67 miles per hour, there should have been almost seven car lengths between it and the next vehicle, but, as was clear from the video, there were only approximately two car lengths between the rental car and the semi-truck in front of it. Due to this violation, Sgt. Kuehne initiated a traffic stop at approximately 11:56:19 a.m. Trooper Dickerson and his K9 Officer, Danny, followed Sgt. Kuehne to the location of the stop to assist. This second encounter with Johnson and Hill was also captured on Sgt. Kuehne's cruiser camera, and the recording was played at the hearing. (Gov. Ex. D (Cruiser Camera of Second Stop).)

7

At approximately 11:56:57 a.m., Sgt. Kuehne approached the car and observed that Hill was now in the driver's seat and Johnson was seated next to her. (*See id.*) He asked Hill to step out of the car and walked her to his patrol car. He then asked dispatch to run a criminal history check on Hill, as he had done for Johnson during the previous stop, to check for out-of-state warrants. While Sgt. Kuehne was waiting for the results of this search, Trooper Dickerson approached the vehicle with Danny. According to the video, the free air dog sniff took place at 12:00:56 p.m. and lasted less than one minute. At 12:01:11 p.m., the dog alerted to the smell of narcotics. (*See id.*) At approximately 12:02 p.m., Trooper Dickerson advised Sgt. Kuehne that there was a positive alert. It is clear from the video that the results of the warrant search came back two minutes after the dog sniff took place (at approximately 12:04:06 p.m.). (*See id.*)

Following the positive alert, Sgt. Kuehne asked Johnson to step out of the car. He patted him down again for weapons, as he had lost contact with Johnson between the first and second stop, and seated Johnson in the back of the patrol car. A subsequent search of the vehicle yielded approximately 19 kilograms of cocaine located in the suitcases that were found in the back seat.

## II. DISCUSSION

### A. Probable Cause Supported the Traffic Stops

The government argues that Sgt. Kuehne had probable cause to temporarily detain the rental vehicle and its occupants because, before initiating each stop, he observed a traffic violation. Johnson contends that neither traffic stop was supported by probable cause. In his motion, he complains that the first stop was based on "an inarticulate hunch of criminal activity" (Doc. No. 25, at 4), and his counsel argued at the suppression hearing that the basis for the second traffic stop was "pretty thin." Johnson's counsel also questioned Sgt. Kuehne's internal motivation for the second traffic stop, claiming that the police "were going to stop this car" to conduct a narcotics investigation, regardless of whether there was a traffic violation.

It is well-settled that an officer has probable cause under the Fourth Amendment to stop a vehicle when he observes a driver violate a traffic law. *United States v. Hughes*, 606 F.3d 311, 315–16 (6th Cir. 2010); *see also United States v. Burton*, 334 F.3d 514, 517 (6th Cir. 2003) (holding that if there was probable cause to believe that a traffic violation has occurred, the resulting traffic stop was constitutionally sound). In making this determination, courts interpret the traffic statute "according to its plain meaning." *See United States v. Stevenson*, 43 F.4th 641, 646 (6th Cir. 2022) (citing Ohio law). So long as the officer has a reasonable belief that the traffic statute has been violated, a stop based on a traffic infraction is lawful. *Id*. at 645–46. The officer's internal motivation is irrelevant; "so long as the officer had probable cause to believe that a traffic violation occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993).

9

*1. First Stop*

Sgt. Kuehne testified credibly that he observed the rental vehicle travel outside its lane on two occasions prior to the first traffic stop. Each departure from the lane constituted a violation of Ohio Rev. Code § 4511.33. Accordingly, the Court finds that this stop was supported by probable cause. *See Hughes*, 606 F.3d. at 315–16.

*2. Second Stop*

Regarding the second traffic stop, Sgt. Kuehne testified credibly that he saw the rental car traveling too closely to another vehicle in violation of Ohio Rev. Code § 4511.34. In *U.S. v. Bonilla*, the Sixth Circuit held (consistent with the Ohio State Highway Patrol guideline) that § 4511.34 "requires one car-length between vehicles for every ten miles per hour of speed" and found a violation when the defendant "follow[ed] approximately one car-length behind a Saturn . . . at speeds approaching sixty miles per hour." 357 F. App'x 693, 695–96 (6th Cir. 2009) (citing *United States v. Dukes*, 257 F. App'x 855, 858 (6th Cir. 2007)). In short, the Sixth Circuit has found that "[t]he law in Ohio is clear that the car-length rule is a workable indicator of a § 4511.34 violation[.]" *Dukes*, 257 F. App'x at 858.

Here, Sgt. Kuehne testified that he estimated that the rental car was traveling at about 67 miles per hour. Applying the Ohio State Highway Patrol guideline, he determined that, at this speed, the driver should have allowed for approximately seven car lengths between the rental car and any vehicle ahead of it on the highway. He testified, consistent with the video, that the rental car was roughly two car lengths behind the semi-truck traveling in the same lane directly in front of it. (*See* Gov. Ex. D. at approximately 11:55:40 a.m.) Because he had a reasonable belief that Hill had violated Ohio Rev. Code § 4511.34, Sgt. Kuehne had probable cause to stop the rental car.

Nevertheless, Johnson contends that Sgt. Kuehne did not have probable cause to believe that Hill had violated Ohio Rev. Code § 4511.34 because "[t]he dash-cam video shows Mr. Johnson's vehicle driving at a reasonable distance from the truck in front of it, which would leave more than sufficient space to brake without causing a collision" and "the driver of the vehicle did in fact apply the brakes multiple times in order to control the following distance." (Doc. No. 25, at 7.) This argument is unavailing, as it misstates the law governing traffic stops. As previously noted, the officer's interpretation of the traffic statute, as well as his belief that the driver violated it, need only be reasonable. *Stevenson*, 43 F.4th at 647 (finding officer's interpretation of the statute reasonable and that the facts supported a "prudent person" believing that defendant had violated it). Sgt. Kuehne testified credibly that, applying the well-accepted benchmark established by the Ohio State Highway Patrol, he believed that Hill was traveling too close to the semi-truck in front of her vehicle; a fact borne out by the cruiser video. Johnson's subjective belief to the contrary is irrelevant. Having found that the evidence supports a finding that Sgt. Kuehne reasonably believed that Hill was in violation of § 4511.34, the Court concludes that the second stop was also constitutionally permissible.

### B. The Stops were not Unduly Prolonged

Additionally, Johnson contends that Sgt. Kuehne unnecessarily prolonged each of the traffic stops. At the hearing, his counsel suggested that the first stop "was a drug stop from the first moment" and that Sgt. Kuehne wrongfully detained Johnson and his passenger for twenty-three minutes while he tried to find an available K9 Officer to come to the scene. Additionally, it is Johnson's position that Sgt. Kuehne unlawfully expanded the scope of the second stop by questioning Hill and Johnson about possible drug activity and by conducting a free air dog sniff of the vehicle. (Doc. No. 25, at 8–9.)

Police activities during an investigatory stop must be reasonably related to the circumstances that initially justified the stop. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985); *Dorsey v. Barber*, 517 F.3d 389, 398 (6th Cir. 2008). "The Fourth Amendment allows police to detain a suspect on reasonable suspicion only for as long as it takes for the police to test the validity of their suspicions." *United States v. Davis*, 430 F.3d 345, 354, 357 (6th Cir. 2005). An initially constitutional stop can "become an impermissible seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *Id.* (quotation marks and citation omitted). "Simply put, 'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)).

Reasonable suspicion to extend a stop exists when an officer can "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Courts look at the "totality of the circumstances" to determine whether an officer has a reasonable basis upon which to suspect criminal wrongdoing. *See United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981) (finding an investigatory stop valid when totality of circumstances gives officers "particularized and objective basis" for suspicion of criminal activity). Under this approach, the Court "must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001); *see also United States v. Winters*, 782 F.3d 289, 301–02 (6th Cir. 2015) (finding that nervousness, implausible travel plans, and odd rental arrangement, considered in the aggregate, supported reasonable suspicion of drug trafficking).

*1. First Stop*

Under the authority cited above, Sgt. Kuehne's actions during the first stop—including asking Johnson and Hill questions about their travel plans, asking for a copy of the rental agreement, and asking Johnson to step out of the vehicle—were all proper and did not prolong the stop. During an investigatory stop, police may ask questions or request documents to establish a person's identity and to confirm or dispel suspicions of criminal activity. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). A request to produce a driver's license and registration, and the initiation of a warrants check upon the driver's license, also do not exceed the scope of a traffic stop. *United States v. Hill*, 195 F.3d 258, 269 (6th Cir. 1999). An officer may even ask questions unrelated to the traffic stop as long as they do not delay the resolution of the traffic infraction. *United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012).

Johnson argues, however, that the stop was unconstitutionally prolonged because it took twenty-three minutes. The Court does not find twenty-three minutes to be an especially long traffic stop. Furthermore, to the extent that there was any delay during this stop, it was caused by Johnson and Hill's vague and conflicting stories, their inability to ever find the rental agreement, and Johnson lying regarding whether he had drug convictions. Therefore, the stop was not unconstitutionally prolonged. *See Sharpe*, 470 U.S. at 687–88 (holding that a stop was not unconstitutionally prolonged because the delay was "attributable almost entirely to the evasive actions of [the suspect], who sought to elude the police"); *U.S. v. Place*, 462 U.S. 696, 709 n.10, 103 S. Ct. 2637, 77 L. Ed. 2d 110 ("[W]e question the wisdom of a rigid time limitation [for stops]. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.").

In fact, Sgt. Kuehne actually had reasonable suspicion to continue the stop even longer based on the many signs of drug trafficking he observed during the stop. *See Hill*, 195 F.3d at 264 ("[A]n officer may detain an individual after a routine traffic stop is completed if the officer has a reasonable suspicion that the individual is engaged in criminal activity."); *U.S. v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016) (holding that an officer had reasonable suspicion sufficient to extend a stop to ask about drug activity based on the driver and passenger's "conflicting answers concerning their travel destination," a jar of what appeared to be urine in the passenger compartment, and the passenger's "erratic behavior"); *Winters*, 782 F.3d at 303–04 (holding that there was reasonable suspicion to justify extending a stop to conduct a dog sniff when the officer observed nervousness, implausible travel plans, and an odd rental arrangement). For the same reasons, Sgt. Kuehne even had reasonable suspicion to use a K9 Officer for a drug sniff at this point, but one was not available.[8]

  2.  *Second Stop*

Sgt. Kuehne did employ the services of a K9 Officer for a free air dog sniff during the second stop. Consistent with the authority cited, in investigating a traffic violation, officers may conduct a canine sniff during a lawful traffic stop as long as the sniff does not extend the duration of the stop beyond the time necessary to address the traffic violation that warranted the stop.

---

[8] At the hearing, Johnson's counsel argued that the delay was caused by Sgt. Kuehne's attempts to obtain a drug sniff dog. This argument is not supported by the record. As was clear from the video, during much of the stop, Sgt. Kuehne was waiting for the results of the warrants check on Johnson, which he received at 4:45:39 a.m. (Gov. Ex. B.) After receiving these results, he told Johnson he had discovered that Johnson had drug convictions, contrary to his earlier statements, and the two of them discussed Johnson's lack of disclosure. At some point during their conversation, Sgt. Kuehne asked dispatch to check whether there were any available K9s in the area. He was ultimately told there were none. After they discussed Johnson's lack of disclosure, Johnson questioned Sgt. Kuehne regarding the reason for the stop. Sgt. Kuehne explained that he had stopped Johnson because he traveled outside his lane, but he made several observations during the stop that raised his suspicions. Johnson then inquired about these observations, and Sgt. Kuehne explained them to him. Even though Sgt. Kuehne had a basis to believe that Johnson was engaged in illegal activity, he told Johnson he was free to leave at 4:50:44 a.m. (*See id.*)

*Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015); *see also United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) ("The Fourth Amendment does not require reasonable suspicion to justify using a drug-detection dog as long as the traffic stop and detention are not unlawful or improperly extended.").[9]

Once the purpose of a traffic stop is fulfilled, an officer "may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)). "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (citing *Terry*, 392 U.S. at 21). To determine whether an officer has reasonable suspicion to further detain a vehicle or its occupants, the court must analyze the totality of the circumstances.

Given that Danny, the K9 Officer, alerted before the results of the warrants search for Hill were known to the troopers, the stop was not impermissibly extended by the dog sniff. *See, e.g.*, *Bell*, 555 F.3d at 542 (holding that dog sniff and questions unrelated to traffic stop did not delay stop as the dog sniff was over before the officer received results of background check); *United States v. Smith*, No. 18-46, 2019 WL 1756279 (E.D. Ky. Apr. 19, 2019) (denying suppression

---

[9] Courts must assess the reliability of a drug-sniffing dog based on the totality of the circumstances. *Florida v. Harris*, 568 U.S. 237, 244–45, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013). The Sixth Circuit has held that "[a] dog's training and reliability is established for the purpose of admitting the dog's alert where 'the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog.'" *United States v. Howard*, 621 F.3d 433, 447 (6th Cir. 2010) (quoting *U.S. v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)). In this case, sufficient evidence was presented of the reliability of K9 Officer Danny. Trooper Dickerson, Danny's handler, testified that he and Danny completed a 15-week training course together in 2019 and then received a certification. He also testified that Danny is recertified each year, and that, at the time of the free air sniff, Danny's certification was current.

motion under similar circumstances).[10] The alert, in turn, provided the reasonable suspicion necessary to search the vehicle and its containers. *United States v. Perez*, 440 F.3d 363, 375 (6th Cir. 2006) (holding that positive alerts by well-trained and reliable drug dogs provided the necessary probable cause to justify the warrant search of the vehicle). *See U.S. v. Ross*, 456 U.S. 798, 799, 102 S. Ct. 2157, 72 L. Ed. 2d 572 ("Where police officers have probable cause to search an entire vehicle, they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages, that may conceal the object of the search.").

### C. Custodial Interrogations (First Stop)

Even if there was probable cause for each stop and the stops were not unduly prolonged, Johnson contends that his statements from the first stop should be suppressed because he was improperly subjected to custodial interrogation without being advised of his *Miranda* rights, and that the evidence obtained from the search of the vehicle during the second stop must be suppressed as fruits of the poisonous tree. (Doc. No. 25, at 4.) These arguments lack merit, however, because Johnson was not in custody or subjected to a police interrogation when he volunteered certain potentially incriminating statements.

The Fifth Amendment, as interpreted in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), protects against uncounseled statements made during custodial interrogations in the absence of a knowing, voluntary, and intelligent waiver of the right against self-incrimination and the right to counsel. *Frazier v. Jenkins*, 770 F.3d 485, 502 (6th Cir. 2014).

---

[10] Johnson contends, however, that the second traffic stop was improperly extended because "[i]n [*Rodriguez v. United States*, 575 U.S. 348, 357, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015)], the [Supreme] Court rejected the Government's argument that law enforcement could extend a stop without reasonable suspicion, as long as the overall duration of the stop was reasonable." (Doc. No. 25, at 9.) Again, the stop was not extended by the dog sniff. The rule the Supreme Court announced in *Rodriguez* is inapposite.

These protections apply to statements made during a "custodial interrogation"—*i.e.*, during "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444; *see also United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (explaining that *Miranda* requirements apply "only when there has been such a restriction on a person's freedom as to render him in custody" (further citations omitted)). "A suspect is 'in custody' for purposes of receiving *Miranda* protection if there has been a 'formal arrest or restraint on freedom of movement.'" *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)).

"'[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *Id*. (quoting *Stansbury v. Ca.*, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994)). "'[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id*. (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)). "The reasonable person test is appropriate because, unlike a subjective test, it does not 'place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question.'" *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990) (quoting *Berkemer*, 468 U.S. at 442 n.35). Several factors guide the analysis, including: "(1) the location of the interview; (2) the length and manner of questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *Hinojosa*, 606 F.3d at 883; *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009).

Courts must consider the totality of the circumstances surrounding the encounter, "with the ultimate inquiry turning on whether a formal arrest occurred or whether there was a restraint on freedom of movement of the degree associated with a formal arrest." *Panak*, 552 F.3d at 465 (quotation omitted). As the defendant seeking suppression, Johnson bears the burden of proving by a preponderance of the evidence that he was subjected to a custodial interrogation. *See United States v. Lawrence*, 892 F.2d 80 (Table), Nos. 88–2056, 88–2086, 88–2087, 88–2109, and 88–2135, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989).

### 1. *Defendant was not in Custody*

The Court finds that the governing factors favor a finding that Johnson was not in custody when he made voluntary statements in the back of the police cruiser. First, Johnson was not handcuffed while he sat in the police cruiser on the side of the road, which, itself, was a fairly non-coercive location. *See U.S. v. Thomas*, 142 F. App'x 896, 897, 900 (6th Cir. 2005) (reasoning that a suspect was not "in custody" in part because the suspect was questioned "in a police car, on a public street"). Second, the conversation that preceded these unsolicited statements was brief, non-confrontational, and designed to quickly confirm or dispel the trooper's suspicions of criminal activity. *See U.S. v. Wright*, 220 F. App'x 417, 420–21 (6th Cir. 2007) (holding that a suspect was not in custody in part because "[t]he purpose of the questioning after the stop was to quickly confirm or dispel the officer's suspicion of criminal activity"). And from the video recording it is evident that Sgt. Kuehne's tone was light and conversational, and he was polite and professional. Most importantly, however, Sgt. Kuehne told Johnson three separate times during this conversation that he was not under arrest. *See U.S. v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998) (explaining, in holding that a suspect was not in custody during a conversation with a police officer, that "[p]erhaps most significantly, [the officer] specifically advised [the suspect] that he was not

under arrest"). Therefore, under the totality of the circumstances, Johnson was not in custody during this conversation.

Johnson, however, emphasized during the hearing that while Sgt. Kuehne asked him questions, he was in the back of a police car and could not open the door on his own. This fact, when considered in light of the other facts discussed above, is insufficient to establish custody. The Sixth Circuit has repeatedly held, in cases where a suspect was placed in a police car, that a suspect was not in custody where other factors—similar to the ones present in the first stop herein—denoted a lack of custody. *See Thomas*, 142 F. App'x at 900 (holding that a suspect was not in custody in the back of a police car because he was detained "without handcuffs" and "the purpose of the police questioning . . . was benign and unintrusive"); *Wright*, 220 F. App'x at 420–21 (holding that a suspect was not in custody in the back of a police car because "the questioning occurred near an apartment complex, a non-coercive location" and "the defendant was questioned for fewer than fifteen of the twenty-four minutes between the stop and his arrest"). Like the suspects in *Thomas* and *Wright*, despite being in a police car, the totality of the circumstances previously mentioned do not support a finding that Johnson was in custody.

        2.       *There was No Interrogation*

Not only was Johnson not in police custody when he made the statements he seeks to suppress, but he also was not subjected to a police interrogation. When he made some of the statements he seeks to suppress, he was alone in the cruiser. While alone, he voluntarily made unprompted statements regarding his current situation. In *Miranda*, 384 U.S. at 478, the Supreme Court explained the difference between a statement that was compelled and one that was voluntary as follows:

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

In *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the Court affirmed that "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." The Court further explained that "interrogation" encompasses "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." *Id.* at 301.

Johnson was not being interrogated when he made the statements that Sgt. Kuehne later heard on the patrol car video because he was not asked any questions at that time—Sgt. Kuehne was away from his cruiser speaking with Hill. Thus, the statements were "given freely and voluntarily without any compelling influences." *Miranda*, 384 U.S. at 478. Because Johnson made voluntary statements and was alone when he made them, he was not "subjected to either express questioning or its functional equivalent." *Innis*, 446 U.S. at 300–01. Therefore, there was no interrogation and no basis upon which to suppress Johnson's statements.

## II. CONCLUSION

For the foregoing reasons, Johnson's motion to suppress is DENIED.

**IT IS SO ORDERED**.

Dated: October 18, 2023

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**